UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WESTPORT RESOURCES MANAGEMENT, INC.,<br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER JAMES DELAURA,<br>    Defendant. | No. 3:16-cv-00873 (VAB) |

**RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER**

On June 7, 2016, Westport Resources Management, Inc. ("WRM") filed a Complaint [Doc. No. 1] seeking a temporary restraining order against the defendant, Christopher James DeLaura, pending an expedited arbitration action against DeLaura before a Financial Industry Regulatory Authority ("FINRA") arbitration panel. The Complaint alleges a claim for breach of contract against DeLaura. On June 7, 2016, WRM also filed a motion for temporary restraining order ("Motion for TRO") [Doc. No. 4] and a motion for waiver of security or bond [Doc. No. 5]. The Court held a hearing on WRM's Motion for TRO on June 15, 2016. For the reasons discussed below, the Motion for TRO is **GRANTED**.

**I.    FINDINGS OF FACT**

Based upon the parties' submissions and the information presented at the June 15, 2016 hearing, the Court finds the following facts:

Christopher James DeLaura worked for both WRM and Westport Resources Investment Services, Inc. ("WRIS") (together, "Westport Resources" or "the company"). WRM, an S corporation registered in the State of Connecticut, is in the discretionary asset management business, and receives fees based on the assets it manages for its clients. It is a registered

1

"Investment Adviser" firm with the Securities and Exchange Commission ("SEC").  WRM has a board of directors, holds annual shareholder meetings, and has salaried employees, as well as individuals who earn fees based on a percentage of the assets that they manage and who must be registered as investment adviser agents.

WRIS, a C corporation registered in the State of Connecticut, is an SEC- and FINRA-registered broker-dealer that transacts trades of stocks, bonds, and mutual funds, and generates income from commissions on these transactions.  WRIS has its own board of directors, holds annual shareholder meetings, and employs independent contractors, known as "registered representatives," who earn commissions.

WRM and WRIS occupy a common physical space and share office equipment, but maintain the costs and expenses of doing business on their own separate books and records.  There is an expense sharing agreement between the two entities, providing for the allocation of payroll and other related, shared, or specified expenses between them.  There is overlap between the clients of WRM and WRIS, although the degree of overlap is not exact.  WRM manages assets on behalf of its clients by providing investment advice, and WRIS executes trades on behalf of its clients.  While more than 90% of WRM's clients are also clients of WRIS, there are a significantly lower percentage of WRIS clients who are also clients of WRM.  In other words, there are some clients of Westport Resources who seek simply to make trades through WRIS and do not also seek investment advice from WRM, and some clients who seek investment advice from WRM but do not also seek to make trades through WRIS.

WRM and WRIS hired Mr. DeLaura in 2010 as a Financial Planning Specialist, with an annual base salary of $115,000.  In addition to having experience providing financial planning advice, Mr. DeLaura also held broker licenses beneficial to WRIS.  In 2012, Mr. DeLaura gained

the additional responsibility of managing portfolios at WRM.  As part of that transition, Mr. DeLaura and WRM (but not WRIS) executed an Investment Adviser Fee Sharing Agreement, which provided that Mr. DeLaura would receive compensation from WRM a follows: a share of the net asset advisory fee revenue earned by the Global Tactical Asset Allocation ("GTAA") investment strategy for the accounts assigned to him, but not in any event less than $30,000 per quarter; and $25,000 per year for continuing to service current clients of WRM regardless of whether they had assets in the GTAA investment strategy.

As part of this agreement, Mr. DeLaura agreed that, for a period of one year following separation from WRM, he would not solicit any client of WRM.  He also agreed that, at the termination of his employment with WRM, he would return all confidential information, including client lists and client account information, to WRM.  The agreement also provided that any dispute between WRM and Mr. DeLaura would be resolved by arbitration according to FINRA arbitration rules, and that WRM would be entitled to injunctive relief from a court of competent jurisdiction to keep Mr. DeLaura from violating this agreement while the arbitration is pending.  In addition, the agreement allowed either party to terminate the agreement upon at least thirty days prior notice.

At some point, the company also named Mr. DeLaura Chief Operating Officer for both WRM and WRIS.  He received a salary for this role, which involved administrative responsibilities.  The expense of Mr. DeLaura's administrative work was allocated 100% to WRM.

Mr. DeLaura never received any commissions from either WRM or WRIS.  He earned income from a salary for his services as a Financial Planning Specialist and Chief Operating

Officer and fees paid on an independent contractor basis for his work as an investment adviser and portfolio manager for WRM.

A number of firms in the securities industry have adopted The Protocol for Broker Recruiting (the "Broker Protocol"). The stated goal of the Broker Protocol is to further clients' interests of privacy and freedom of choice in connection with the movement of their registered representatives between firms. The Broker Protocol forecloses any liability a departing registered representative or his or her new firm may incur by reason of the registered representative taking certain information with him or her upon leaving one signatory firm for another. WRIS is a signatory to the Broker Protocol, but WRM is not.

On May 26, 2016, Mr. DeLaura gave a letter of resignation to John Vacarro, the Chief Executive Officer of both WRM and WRIS. However, he addressed the letter to Mr. Vacarro only in his capacity as C.E.O. of WRIS, and, in it, resigned his position with WRIS, effective immediately. The letter contained no reference to Mr. DeLaura's position with WRM. In the letter, Mr. DeLaura invoked the protections of the Broker Protocol, and stated that, consistent with the Broker Protocol, he was providing a list of clients whose accounts he serviced while at WRIS. The list contained 32 clients and 102 accounts, a significant portion of WRM's business. Mr. DeLaura's resignation letter further stated that he had accepted a position with Fieldpont Private Bank & Trust.[1]

Mr. DeLaura began working immediately for Fieldpoint upon resigning from WRIS. Indeed, he contacted and began soliciting WRM clients, who also were WRIS clients, on the list that same day. Clients began contacting Westport Resources as early as the next morning to inform the company that they were following Mr. DeLaura to Fieldpoint.

---

[1] There is more than one Fieldpoint entities. This opinion will refer to the entities collectively as "Fieldpoint."

Under Rule 13804 of the FINRA Dispute Resolution Code of Arbitration Procedure, a plaintiff has the right to seek interim injunctive relief from this Court pending an arbitration hearing before a panel of duly appointed arbitrators, and the Rule provides for an expedited arbitration hearing to be scheduled within fifteen days of the Court's issuance of such interim injunctive relief. WRM has brought this action, seeking to enforce those rights.

## II.   LEGAL STANDARD

"A temporary restraining order is a short-term protective device authorized under Rule 65 of the Federal Rules of Civil Procedure. Its purpose is to protect a party from irreparable harm until more lasting relief . . . can be sought." *HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (citing *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)). "The court may grant a motion for temporary restraining order if the moving party demonstrates a risk of irreparable harm and either a) a likelihood of success on the merits or b) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly favoring the party requesting the relief." *Ward v. Thomas*, 895 F. Supp. 401, 403 (D. Conn. 1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979)).

## III.   CONCLUSIONS OF LAW

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

On the basis of the factual findings discussed above, the Court finds that WRM has shown a likelihood of success on the merits on its breach of contract claim. Mr. DeLaura does not dispute the validity of the Investment Adviser Fee Sharing Agreement between himself and WRM. He also does not dispute that his actions subsequent to his resignation from Westport Resources violate the terms of that agreement. Instead, he argues that the Broker Protocol

entered into by WRIS precludes WRM from enforcing its agreement with him.  The Court disagrees.

The Broker Protocol only allows registered representatives who move from one signatory firm to another to take certain information concerning "the clients that they serviced while at the firm."  Protocol for Broker Recruiting, Def. Ex. C.  While Mr. DeLaura contends the Court should deem any efforts on behalf of WRIS clients as "service" within the meaning of the Broker Protocol, the Court instead adopts the more logical definition of service:  what clients pay registered representatives to do on their behalf.  *See Imaginative Research Associates, Inc. v. Ramirez*, 718 F. Supp. 2d 236, 250 (D. Conn. 2010) (in construing contracts under Connecticut law, language must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to contract's subject matter) (citing *Office of Labor Relations v. New England Health Care Employees Union, District 1199, AFL-CIO*, 288 Conn. 223, 231 (2008)).  This logical and straightforward way to define "service" eliminates the need for courts having to divine and define what else—other than what a client is paying for—constitutes service.

Here, registered representatives at WRIS executed trades on behalf of WRIS clients and these registered representatives, in turn, were compensated for providing this service by receiving commissions on these trades.  There is no dispute that Mr. DeLaura never received any commissions for any trades on behalf of WRIS clients.  Since Mr. DeLaura did not receive commissions as a broker-dealer for any of these 32 clients, he did not provide "service" to these clients under the Broker Protocol.

Even if Mr. DeLaura did provide "service" to these WRIS clients, for which he was not compensated in the form of WRIS commissions, there is no reason for this Court to credit this "service" as work performed while at WRIS.  Mr. DeLaura had a financial incentive to ensure

6

that any of these clients, who also were WRM clients, stayed with WRM. *See* Westport Resources Management, Inc. Investment Adviser Fee Sharing Agreement, Pl. Ex. 3, at 8 ("DeLaura shall be compensated based on the market value of assets under management on the last day of the preceding calendar quarter."). More importantly, for these WRM clients, whether or not they also were WRIS clients, Mr. DeLaura agreed not to solicit their business or provide or disclose their confidential information to third parties, which he has done. *See id.* at 10-13 (detailing the non-solicitation, confidential information, and non-disclosure provisions of the 2012 agreement between Mr. DeLaura and WRM).

Accordingly, the Court concludes that Plaintiff has established a likelihood of success on the merits.

### B.    IRREPARABLE HARM

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (quotation marks omitted). "However, a perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Courts in the Second Circuit consistently have held that "when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). As the Second Circuit has explained, "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship

with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).  Furthermore, numerous Connecticut State courts, as well as courts specifically in this district, "have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant." *United Rentals, Inc. v. Bastanzi*, No. 3:05-cv-596, 2005 WL 5543590, *8, 2005 U.S. Dist. LEXIS 45268, *25-26 (D. Conn. Dec. 22, 2005) (citing cases).

In this case, much like in *Ticor*, "the employment contract sought to be enforced concedes that in the event of [defendant's] breach of the post-employment competition provision, [plaintiff] shall be entitled to injunctive relief," which "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision." *Ticor*, 173 F.3d at 69.  Moreover, as in *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420 (D. Conn. 2004),

> if not enjoined, [defendant] is likely to continue to solicit and service [plaintiff's] customers and to aid [his] employer in doing so as well.  [He] has also disclosed customer lists to [his] employer and may do so in the future.  Those things are likely to diminish [plaintiff's] existing customer base and decrease its goodwill.  Such damage cannot be repaired with money.

*Id.* at 423 (citing *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977).[2]

Defendant cites cases from other jurisdictions in support of his view that there is no irreparable harm here.  These cases, however, do not undercut the notion that Connecticut law

---

[2] *See also Smith Barney v. Smith*, No. 3:09-cv-597, Doc. No. 20 (D. Conn. Apr. 16, 2009) (enjoining defendant from continuing to contact her former customers and ordering the return of client information pending FINRA arbitration because there is a "public interest in the protection of the goodwill of businesses" and "case law in Connecticut and also in the Second Circuit . . . has fairly consistently recognized that a former employee who, in effect, takes [or attempts to take] a client from their former employer in violation of an employment contract, that is irreparable harm"); *Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1031 (N.D. Iowa 2010) (holding that plaintiff "has no adequate remedy at law" because "the mere violation of" non-disclosure and non-solicitation covenants "suffices to show irreparable harm, because violation of such covenants involves much the same threat to goodwill and business relationships with customers as violation of a covenant not to compete").

recognizes irreparable harm in this type of case, particularly given the loss of goodwill associated with a breach of this type of employment agreement. *See, e.g.*, *POP Radio, LP v. News Am. Mktg. In-Store, Inc.*, 49 Conn. Supp. 566, 576 (2005) (noting that prior Connecticut cases "collectively appear to develop a theme that combines the concepts of the inherent difficulties of proving harm which might not occur until the future and the need to enjoin an ongoing breach of an agreement which devalues the agreement itself and potentially the company's goodwill, both of which are business assets"). In addition, in one of the cases cited by Defendant, the court based its conclusion, in part, on the fact that the plaintiff had "an adequate legal remedy immediately available to it in the form of an expedited injunctive relief hearing" before an arbitration panel. *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375 (N.D. Ga. 2001). Unlike in that case, the plaintiff in this case is not entitled to an expedited arbitration hearing without the issuance of a temporary restraining order from a court of competent jurisdiction.

Accordingly, the Court finds a risk of irreparable harm to WRM.

## IV.     TEMPORARY RESTRAINING ORDER

Plaintiff's motion and Defendant's opposition having been heard by the Court, and the Court having reviewed the entirety of the record in this case, and the Court having concluded for the foregoing reasons that pending the FINRA Rule 13804 expedited arbitration, Plaintiff is entitled to a temporary restraining order, Plaintiff's Motion for a TRO [Doc. No. 4] is GRANTED; and

**IT IS HEREBY ORDERED** that, under Federal Rule of Civil Procedure 65:

(1)     Defendant is temporarily enjoined from, directly or indirectly, on his own behalf or on behalf of anyone else, soliciting in any manner or inducing or attempting to

induce any client of WRM to take away all or an portion or a client's business from WRM or otherwise terminate the client relationship with WRM;

(2) Defendant is temporarily enjoined from, directly or indirectly, on his own behalf or on behalf of anyone else, rendering investment advice or otherwise selling any security or other financial product to any client or prospective client with whom he had personal contact or otherwise became aware, during his employment by WRM, except that nothing herein shall prevent Defendant from communicating with any former client of WRM as of June 7, 2016 provided that (i) any communication with a former client is initiated by the former client and not Defendant, (ii) Defendant does not solicit or attempt to solicit their business, and (iii) Defendant does not disparage, slander, or otherwise criticize Westport Resources, its agents, employees, and representatives or any of its services;;

(3) Defendant is directed to return to WRM within 24 hours of the issuance of this Order any and all records and documents in any form—including electronically stored information—received or removed from WRM, containing information pertaining to clients of WRM with whom Defendant worked or whose name became known to Defendant while employed by WRM;

(4) Defendant is directed to file a declaration within 24 hours of the issuance of this Order, attesting that he has deleted, destroyed, or returned to WRM all confidential client information; and

(5) the parties are further directed to proceed toward an expedited arbitration hearing on the merits before a FINRA arbitration panel pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Waiver of Security or Bond [Doc. No. 5] is GRANTED because under the circumstances of this case, the Court finds that no bond is necessary.[3]

This temporary restraining order shall remain in full force and effect for **fourteen days**, unless before the expiration of the fourteen days, (1) this Court for good cause extends it for a like period or Defendant consents to a longer extension or (2) a decision is issued by a FINRA arbitration panel.

SO ORDERED at Bridgeport, Connecticut, this 23rd day of June, 2016.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[3] *See Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (bond not required where no proof injunction likely to cause harm); *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782-83 (10th Cir. 1964) (bond not required when defendant has "considerable assets and . . . is able to respond in damages if [defendant] does suffer damages by reason of the injunction").